IN THE UNITED STATES DISTRICT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

EUNICE HUSBAND,

        **Plaintiff,**

v.                                                         Civil Action No. 2:10cv4
                                                              (Judge Bailey)

**HARRELL WATTS, K.M. WHITE,
JOE DRIVER, JON CROGAN,
LEONARD ODIDO, LORNA KING,
BRAD TRATE, THOMAS WATSON,
DERRICK MOSLEY, MATTHEW
DOYLE, KEVIN KAMICKER, NEAL
SHULTZ, STEVEN EIRICH, ROBERT
FABER, ANTONIO JORGE, MICHAEL
DULEY, ERIC PHILLIPS, AND
WILLIAM HOZAPFEL**

        **Defendants.**

## REPORT AND RECOMMENDATION

### I. Procedural History

On January 12, 2010, the *pro se* plaintiff initiated this case by filing a complaint against the above-named defendants which was docketed pursuant to Bivens v. Six Unknown Federal Narcotics Agents, 403 U.S. 388 (1971). The plaintiff was granted permission to proceed as a pauper on February 5, 2010, and paid an initial partial filing fee on February 25, 2010. Upon a preliminary review of the file, the undersigned determined that summary dismissal was not appropriate at that time and directed the United States Marshal Service to serve the Complaint.

On December 16, 2010, the defendants filed a Motion to Dismiss or, in the Alternative, Motion for Summary Judgment. Because the plaintiff is proceeding *pro se*, the Court issued a

Roseboro Notice on December 20, 2010.[1] The plaintiff filed a response to the defendants' motion on February 25, 2011.[2]

## II. Contentions of the Parties

### A. The Complaint

The plaintiff alleges that on January 8, 2008, at approximately 8:15 p.m., he was physically assaulted by defendants Mosley, Doyle, Kamicker, Shultz, Eirich, Faber, Jorge, Duley, Phillips, and Hozapfel, all of whom were correctional officers assigned to USP Hazelton. The plaintiff further maintains that the physical abuse did not end until the following morning at approximately 3:15 a.m. The plaintiff maintains the incident began when he was escorted to the Special Housing Unit ("SHU") by Shultz and Faber for possessing a weapon. The plaintiff alleges that he was placed in a holding cell to be strip searched. According to the plaintiff, during the strip search, staff claim that he reached into his shorts and began placing unknown objects in his mouth and refused an order to stop. However, the plaintiff declares that he did not place any objects in his mouth, did not move his hands from his shorts to his mouth, and did not refuse any orders of the officers. However, officers entered the holding cell, and the plaintiff maintains that Doyle punched him in the left cheek, and other officers punched him in the face, neck and upper body. He also claims that the officers slammed his face into the concrete floor, and Shultz choked him while yelling, "I want to kill you nigger. I want to kill you real bad nigger." (Doc. 1, p. 7). The plaintiff also alleges that other officers punched him, twisted, pulled and yanked his arms, hands, wrists, legs, ankles, and

---

[1] Roseboro v. Garrison, 528 F.2d 309, 310 (4th Cir. 1975) (finding that the court must inform a *pro se* plaintiff of his right to file material in response to a motion for summary judgment).

[2] The plaintiff filed duplicate copies of the response on February 28, 2011. Compare Documents 66, 70, and 71.

back into awkward and painful positions. The plaintiff alleges that he experienced difficulty and pain while breathing, talking, eating and drinking for about two to three weeks thereafter and has a permanent scar on his neck. The plaintiff continues that the officers slammed his back into the wall and shoved and pushed him down into a sitting position with his hands cuffed behind him. The plaintiff continues by alleging that the officers threw into a wheelchair, rammed his legs and feet into the bars and walls of the holding cell before moving him to the SHU medical examination room. The plaintiff next alleges that after leaving the examination room, the officers removed him from the wheelchair and slammed him on his back, with his hands still cuffed behind him, onto a gurney. Thereafter, the plaintiff alleges that he was escorted out into the cold wearing only a pair of pants. He was transferred by ambulance to Ruby Memorial Hospital in Morgantown, West Virginia, accompanied by defendants Watson, Hozapfel and Phillips. On the return trip, the plaintiff was transported by the same defendants in a government vehicle. The plaintiff maintains that once back at Hazelton, he was ordered out of the vehicle and made to walk back into the prison barefoot and wearing only pants.

As a result of the alleged assault on January 8-9, 2008, the plaintiff contends that he sustained an abrasion to his left forehead, a laceration under his left eye, a contusion to his right shoulder, a superficial scratch to his right scapula, and a broken right hand. In addition, the plaintiff maintains that although he had never before in his life fainted, two weeks after the assault, he passed out and hit his right forehead on the floor causing a deep gash.

The plaintiff alleges that his Eighth Amendment Right to be free from cruel and unusual punishment was violated by staff members during the assault as well as his First Amendment right to be free of racial discrimination. For relief, the plaintiff seeks $25,000,000 from each of the

defendants.

**B.  The Defendants' Motion to Dismiss or for Summary Judgment**

In their memorandum in support of their motion to dismiss or, in the alternative, for summary judgment, the defendants argue that the plaintiff's complaint should be dismissed for the failure to state a claim for which relief may be granted. In support of that argument, the defendants assert:

(1) the plaintiff's claims against defendants Watts, Driver, White, Grogan, King, Oddo, Trate and Watson should be dismissed for failure to exhaust administrative remedies prior to filing the complaint;

(2) the plaintiff's claims against defendants Watts, Driver, White, Crogan, King, Oddo, and Trate should be dismissed due to lack of personal involvement;

(3) the plaintiff fails to establish a violation of his constitutional rights for which relief could be granted under the Eighth Amendment; and

(4) the plaintiff's claims against all defendants should be dismissed because the defendants are entitled to qualified immunity.

**C.  The Plaintiff's Response to the Defendants' Motion to Dismiss**

In his response to the motion to dismiss, the plaintiff asserts that he did properly exhaust his administrative remedies with respect to defendants Watts, Driver, White, Crogan, King, Oddo, Trate, and Watson, and accuses the defendants of fabricating or falsifying his administrative remedies and in particular his BP-9. In addition, the plaintiff argues that his claims against defendants Watts, Driver, White, Crogan, King, Oddo, and Trate should not be dismissed for lack of personal involvement. The plaintiff maintains that they are liable because they were indifferent to the assault perpetrated by the other defendants. Additionally, the plaintiff maintains that he has established a

4

violation of his Eight Amendment rights. Finally, the plaintiff maintains that the defendants are not entitled to qualified immunity.

### III. Standard of Review

**A. Motion to Dismiss**

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding facts, the merits of a claim, or the applicability of defenses." Republican Party of N.C. v. Martin, 980 F.2d 943, 952 (4th Cir.1992) (citing 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1356 (1990)). In considering a motion to dismiss for failure to state a claim, a plaintiff's well-pleaded allegations are taken as true and the complaint is viewed in the light most favorable to the plaintiff. Mylan Labs, Inc. v. Matkari, 7 F.3d 1130, 1134 (4th Cir.1993); see also Martin, 980 F.2d at 952.

The Federal Rules of Civil Procedure "require[ ] only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.' " Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)). Courts long have cited the "rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [a] claim which would entitle him to relief." Conley, 355 U.S. at 45-46. In Twombly, the United States Supreme Court noted that a complaint need not assert "detailed factual allegations," but must contain more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." Conley, 550 U.S. at 555 (citations omitted). Thus, the "[f]actual allegations must be enough to raise a right to relief above the speculative level," id. (citations omitted), to one that is "plausible on its face," id. at 570, rather than

merely "conceivable." Id. Therefore, in order for a complaint to survive dismissal for failure to state a claim, the plaintiff must "allege facts sufficient to state all the elements of [his or] her claim." Bass v. E.I.DuPont de Nemours & Co., 324 F.3d 761, 765 (4th Cir.2003) (citing Dickson v. Microsoft Corp., 309 F.3d 193, 213 (4th Cir.2002); Iodice v. United States, 289 F.3d 279, 281 (4th Cir.2002)). In so doing, the complaint must meet a "plausibility" standard, instituted by the Supreme Court in Ashcroft v. Iqbal, where it held that a "claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009). Thus, a well-pleaded complaint must offer more than "a sheer possibility that a defendant has acted unlawfully" in order to meet the plausibility standard and survive dismissal for failure to state a claim. Id.

**B. Summary Judgment**

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." In applying the standard for summary judgment, the Court must review all the evidence "in the light most favorable to the nonmoving party." Celotex Corp. V. Catrett, 477 U.S. 317, 322-23 (1986). The court must avoid weighing the evidence or determining the truth and limit its inquiry solely to a determination of whether genuine issues of triable fact exist. Anderson v. liberty lobby, Inc., 477 U.S. 242, 248 *1986).

In Celotex, the Supreme Court held that the moving party bears the initial burden of informing the Court of the basis for the motion and of establishing the nonexistence of genuine issues of fact. Celotex at 323. Once "the moving party has carried its burden under Rule 56, the opponent must do more than simply show that there is some metaphysical doubt as to material facts." Matsushita

Electric Industrial Co. V. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The nonmoving party must present specific facts showing the existence of a genuine issue for trial. Id. This means that the "party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts showing that there is a genuine issue for trial." Anderson at 256. The "mere existence of a scintilla of evidence" favoring the nonmoving party will not prevent the entry of summary judgment. Id. at 248. To withstand such a motion, the nonmoving party must offer evidence from which a "fair-minded jury could return a verdict for the [party]." Id. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1128 (4th Cir 1987). Such evidence must consist of facts which are material, meaning that they create fair doubt rather than encourage mere speculation. Anderson at 248. Summary judgment is proper only "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." Matsushita at 587 (citation omitted).

## IV. Analysis

**A. Exhaustion of Administrative Remedies**

Under the Prison Litigation Reform Act (PLRA), a prisoner bringing an action with respect to prison conditions under 42 U.S.C. § 1983, or any other federal law, must first exhaust all available administrative remedies. 42 U.S.C. § 1997(e)(a). Exhaustion as provided in § 1997(e)(a) is mandatory and "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes,"[3] and is required even when the relief sought is not available. Booth v. Churner, 532 U.S. 731, 741 (2001). Because exhaustion is a prerequisite to suit, all

---

[3] Porter v. Nussle, 534 U.S. 516, 524 (2002).

available administrative remedies must be exhausted *prior to* filing a complaint in federal court. See Porter v. Nussle, 534 U.S. at 524 (citing Booth, 532 U.S. at 741) (emphasis added).

Moreover, in Woodford v. Ngo, 548 U.S. 81 (2006), the United States Supreme Court found that the PLRA's exhaustion requirement serves three main purposes: (1) to "eliminate unwarranted federal court interference with the administration of prisons"; (2) to "afford corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case"; and (3) to "reduce the quantity and improve the quality of prisoner suits." Therefore, "the PLRA exhaustion requirement requires *full* and *proper* exhaustion." Woodford at 93-94 (emphasis added). Full and proper exhaustion includes meeting all the time and procedural requirements of the prison grievance system. Id. at 103.

The Bureau of Prisons makes available to its inmates a three level administrative remedy process if informal resolution procedures fail to achieve sufficient results. See 28 C.F.R. § 542.10, et seq. This process is begun by filing a Request for Administrative Remedy at the institution where the inmate is incarcerated. If the inmate's complaint is denied at the institutional level, he may appeal that decision to the Regional Office for the geographic region in which the inmate's institution of confinement is located. (For inmates confined at FCI-Hazelton, those appeals are sent to the Mid-Atlantic Regional Director in Annapolis Junction, Maryland.) If the Regional Office denies relief, the inmate can appeal to the Office of General Counsel via a Central Office Administrative Remedy Appeal. An inmate must fully complete each level of the process in order to properly exhaust his administrative remedies.

In their response, the defendants assert that the plaintiff has not exhausted his administrative remedies against all the named defendants. More specifically, the defendants assert that the plaintiff

only has exhausted one administrative remedy with respect to the alleged assault on him on January 8, 2008. However, in that remedy, the plaintiff failed to name defendants Watts, Driver, White, Crogan, King, Oddo, Trate and Watson. (Doc. 56-19).[4] Accordingly, the defendants argue that the plaintiff exhausted only his claims regarding the actual assault he alleges took place on January 8, 2008, and filed no administrative remedies which address any claims against administrative officials who he now asserts were indifferent to the guards' assault against him.[5]

In response, the plaintiff alleges that the defendants have fabricated or falsified the administrative remedies, and in particular, the BP-9. In support of this assertion, the plaintiff calls the court's attention to the administrative remedies he provided the court in response to an Order dated May 18, 2010. (Doc. 13). The plaintiff did, indeed, provide the court with copies of his administrative remedies regarding the alleged assault. However, the documents that the plaintiff provided specifically name Officers Shultz, M. Doyle, K. Kamicker, S. Eirich, R. Faber, E. Phillips, A. Jorge, and M. Duley.[6] They do not name defendants Watts, Driver, White, Crogan, King, Oddo, Trate, and Watson, and therefore, those defendants should be dismissed with prejudice for failure

---

[4]Specifically, the plaintiff complains that on Tuesday, January 8, 2008, at approximately 8:15 p.m. "while in my in a holding cell in Special Housing I was assaulted by officers Shultz, M. Doyle, K. Karmicker, S. Eirich, R. Faber, E. Phillips, A. Jorge and M. Dulaney." (Doc. 56-19, p. 1).

[5]The plaintiff repeatedly uses the phrase "failed to show indifference to the assault on the plaintiff." However, the undersigned assumes that the plaintiff intended to allege that the various administrative defendants were indifferent to the alleged assault.

[6]In his Central Office Appeal, the plaintiff also indicates that the assault continued when Lt. Watson and SIS Tech, Hozapfel arrived, and the plaintiff specifically alleges that defendant Hozapfel pressed down on his wrists while "the black box and cuffs were applied, he nearly shattered my wrists." (Doc. 21-1, p.2).

9

to exhaust administrative remedies.[7] However, even if the court were to determine that the plaintiff had exhausted his administrative remedies against defendants Watts, Driver, White, Crogan, King, Oddo, Trate, and Wilson, they would still be subject to dismissal due to lack of personal involvement and because <u>Bivens</u> liability may not be premised on a theory of respondeat superior.

**B. <u>Lack of Personal Involvement/Respondeat Superior</u>**

Liability in a <u>Bivens</u> case is "personal, based upon each defendant's own constitutional violations." <u>Truloch v. Freeh</u>, 2755 F.2d 391, 402 (4th Cir. 2001) (internal citation omitted). Thus, in order to establish liability in a <u>Bivens</u> case, the plaintiff must specify the acts taken by each defendant which violate his constitutional rights. See <u>Wright v. Smith</u>, 21 F.3d 496, 501 (2d Cir. 1994); <u>Colburn v. Upper Darby Township</u>, 838 F.2d 663, 666 (3rd Cir. 1988). Some sort of personal involvement on the part of the defendant and a causal connection to the harm alleged must be shown. See <u>Zatler v. Wainbright</u>, 802 F.2d 397, 401 (11th Cir. 1986). Moreover, respondeat superior cannot form the basis of a claim for violation of a constitutional right in a <u>Bivens</u> case. <u>Rizzo v. Good</u> 423 U.S. 362 (1976); <u>Lopez v. Robinson</u>, 914, F.2d 486, 494 (stating that defendants in a § 1983 action (the State counterpart to a <u>Bivens</u> claim) must be personally involved with the incidents of alleged constitutional deprivation because liability under § 1983 cannot be premised on respondeat superior.

Here, Plaintiff does not allege any personal involvement on the part of Defendant Watts, White, or Driver in the alleged use of excessive force. Instead, it appears that Plaintiff has named

---

[7]Ordinarily, the undersigned would recommend that these defendants be dismissed without prejudice for failure to exhaust administrative remedies. However, if an inmate is unable to resolve his complaint informally, he must file a formal written complaint within twenty calendar days of the date of the occurrence on which the complaint is based. 28 C.F.R. § 542.14(a). Because the assault and alleged indifference occurred more than three years ago, the plaintiff cannot now pursue administrative remedies against the additional defendants, and he is barred from recovery against said defendants.

Watts in his official capacity as the Administrator of National Inmate Appeals, White in his official capacity as Regional Director of the Mid-Atlantic Regional Office, and Driver in his official capacity as the Warden of USP Hazelton. However, a suit against government agents acting in their official capacities is considered a suit against the United States itself. See Kentucky v. Graham, 473 U.S. 159, 165 (1985) ("Official-capacity suits . . . 'generally present only another way of pleading an action against an entity of which an officer is an agent.'"). Furthermore, any involvement that these individuals had in the coordination or denial of the plaintiff's administrative remedies is not the type of personal involvement required to state claim under Bivens. See Roddy v. Waid, 2009 WL 1468366 (N.D.W.VA. May 26, 2009). Thus, remedy under Bivens is not available against these defendants, and they should be dismissed as a defendant in this action.

Furthermore, The plaintiff, himself, states that he named Defendants Watts, White, Driver, Crogan, Oddo, King, and Trate as defendants solely because he believed that they supervised the officers who took part in the use of force in the holding cell. Accordingly, the plaintiff has not alleged the type of personal involvement that would subject any of these defendants to liability in this matter.

**C.   Excessive Force**

Analysis of a claim for use of excessive force begins with "identification of the specific constitutional right allegedly infringed by the challenged application of force." Graham v. Connor, 490 U.S. 386, 394 (1989). In the context of a claim by a prisoner that he was subjected to excessive force by prison employees, the source of the ban against such force is the Eighth Amendment's ban on cruel and unusual punishments. The validity of the prisoner's claim must "be judged by reference to th[is] specific constitutional standard...rather than to some generalized 'excessive force'

11

standard." Graham v. Connor, supra at 394; *see e.g*, Whitley v. Albers, 475 U.S. 312, 318-326 (1986)(claim of excessive force to subdue convicted prisoner is to be analyzed under an Eighth Amendment standard).

A claim of cruel and unusual punishment in violation of the Eighth Amendment has two components-one subjective, focusing on the defendant's motive for his conduct, and the other objective, focusing on the conduct's effect. See e.g., Hudson v. McMillian, 503 U.S. 1, 7-8 (1992). The subjective component of the claim requires a showing that the defendant "had the necessary level of culpability, shown by actions characterized by 'wantonness'" in light of the particular circumstances surrounding the challenged conduct. Wilson v. Seiter, 501 U.S.294, 299 (1991). When prison officials are accused of using excessive force, the "wantonness" issue turns on "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Hudson, at 7 (internal quotation marks omitted).

The objective component of a claim of cruel and unusual punishment focuses on the harm done, in light of "contemporary standards of decency." Hudson at 8. In assessing this component, the court must ask whether "the alleged wrongdoing was objectively 'harmful enough' to establish a constitutional violation." Id. (quoting Wilson, supra at 298). When prison official use force to cause harm maliciously and sadistically, "contemporary standards of decency always are violated... This is true whether or not [sic] significant injury is evident." Hudson at 9. However, the Eighth Amendment's prohibition against cruel and unusual punishment does not extend to "*de minimus* use of physical force provided that the use of force is not the sort repugnant to the conscience of mankind." Id. at 10 (internal quotation marks omitted). "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional

12

rights.'" Id. at 9 (quoting Johnson v. Glick, 481 F.2d 1028, 1033 (2nd Cir. 1973).

In this case, there appears to be no dispute that the plaintiff consented to a pat search on January 8, 2008. The plaintiff was found to be in possession of a knife. Accordingly, he was placed in hand restraints and escorted to the SHU. The defendants maintain that once in the holding cell, officers conducted a visual search which is conducted by the inmate undressing so that officers can see whether the inmate is attempting to introduce contraband into the unit. The defendants further maintain that when the plaintiff had undressed down to his boxer shorts, he ran to the back of the holding cell and began ingesting what appeared to be small plastic bags containing suspected narcotics. (Doc. 56-3). A body alarm then sounded, and approximately five correctional officers entered the holding cell, gained control of his legs and placed him in hand restraints. Each of the correctional officers deny hitting, pushing, punching or pulling the plaintiff. (Docs. 56-2, 56-3, 56-5. 56-4, 56-8, and 56-9). Approximately 35 bags of suspected narcotics were recovered from the plaintiff, and the contents of the bags tested positive for marijuana. Both the knife and the plastic bags containing marijuana were turned over to the FBI for investigation and possible criminal prosecution.[8] (Doc. 56-3).

An injury assessment was performed on the plaintiff immediately after the use of force. The assessment noted that the plaintiff refused to communicate with or assist Nurse Dennison during his examination. Despite this fact, Nurse Dennison's physical assessment of the plaintiff revealed a 1 cm abrasion on the his left forehead, a .5 cm abrasion under his left eye, a 6 cm contusion on his left

---

[8]In fact, the plaintiff is currently serving a 120 month sentence to be followed by four years supervised release resulting from a March 24, 2009 conviction in the United States District Court for the Northern District of West Virginia for a violation of 18 U.S.C. § 1791 (A)(2) and (B)(3) and 21 U.S.C. § 841 (A)(1) and (B)(1)(d) "Possession of a Prohibited Object/Weapon," and 21 U.S.C. § 851 "Possession with Intent to Distribute Marijuana." See 1:08-cr-00016 IMK-JSK.

shoulder and a 6 cm superficial scratch on his right shoulder. (Doc. 56-12. P. 2). In addition, it was noted on the assessment that the plaintiff was to be transported to the hospital for treatment of possible ingestion of narcotics. (56-12, p. 3). The plaintiff did not complain of pain in his arm/elbow until January 22, 2008, almost two weeks after the use of force. On that date, the plaintiff received a second injury assessment in the SHU because he reported that he had fallen in the shower and hit his right forehead and right shoulder after becoming dizzy and momentarily blacking out. He was observed as alert and responsive with a 1 cm superficial laceration to his right forehead and a contusion with slight swelling. His laceration was cleaned, and he was given 800 mg of Motrin to be taken three times daily for five days. On January 23, 2008, the plaintiff was seen again by Health Services staff, who prescribed him Motrin to be taken every eight hours for three days. Again, his superficial forehead laceration and shoulder strain were noted. On March 6, 2008, almost three months after the use of force in the SHU holding cell, the plaintiff reported to Health Services that he had continued pain in his right arm/elbow as a result of the injury during the use of force. An x-ray was requested on March 6, 2008. On March 13, 2008, an x-ray was taken of the plaintiff's right arm/elbow. The radiology report indicates that the x-ray revealed "positive distal radius bone cyst/endochrome." This means that the radiologist did find that the plaintiff had a bone cyst or an endochrome on his right elbow that had healed. However, there is no way to determine when this possible injury could have occurred. (Doc. 56-12, pp. 3-4).

Finally, there is nothing of record to support the plaintiff's allegations that he was forced to travel to and from the hospital the night of the use of force in nothing but pants. Defendant Watson, has submitted a Declaration in which he indicates that he has no independent recollection of escorting the plaintiff to the hospital. However, he does state that he would not have forced the plaintiff or any inmate to go out of the institution unclothed or forced them to walk barefoot across the packing lot

14

in the middle of winter. (Doc. 56-24). In addition, defendant Holazpfel has also filed a Declaration in which he states that he recalls escorting the plaintiff to the hospital but does not recall him walking back into the institution in bare feet. Furthermore, although the plaintiff alleges that defendant Phillips was part of the transport team, said defendant has submitted a declaration in which he states that he did not escort the plaintiff to the hospital because, at that time, he was not yet certified to go on escort trips of of the institution.

It is clear from the medical records that the plaintiff suffered only *de minimus* injury, at the very most, as a result of the immediate use of force. While a "significant injury" is not a threshold requirement for stating an excessive force claim, that does not mean that the absence of a serious injury is irrelevant to an Eighth Amendment inquiry. "[T]he extent of injury suffered by an inmate is one factor that may suggest 'whether the use of force could plausibly have been thought necessary' in a particular situation." Hudson at 7 (quoting Whitley v. Albers, 475 U.S. 312, 321 (1986). Given that the plaintiff was found in possession of a knife and subsequently attempted to ingest bags of marijuana, in an apparent effort to avoid being charged with possession of illegal drugs, it is clear that the force used in the SHU holding cell was applied in a good-faith effort to maintain or restore discipline, not maliciously or sadistically to cause harm. Accordingly, the plaintiff's allegations of excessive force fail to establish that his Eighth Amendments rights were violated.

## D. Racial Discrimination

In addition to his claim of excessive force, the plaintiff also alleges that he was the victim of racial discrimination. In support of that allegation, the plaintiff alleges that defendant Shultz stated "I want to kill you nigger. I want to kill you real bad nigger." (Doc. 1, p. 11). Name-calling alone cannot form the basis of a constitutional violation because a person has no liberty interest at stake. Numerous courts around the country have held that "even the most abusive verbal attacks do not

violate the constitution." Oltarzewski v. Rggiero, 830 F.2d 136, 139 (9th Cir. 1987); Collins v. Cundy, 603 F.2d 825, 827 (10th Cir. 1979). Nor do words or threat amount to assault under 42 U.S.C. § 1983. Pierce v. King, 918 F.Supp. 932 (E.D.N.C. 1996), aff'd, 113 F.3d 136 (4th Cir. 1997), cert. granted and judgment. Vacated on other grounds, 525 U.S. 802 (1998). Likewise racial epithets do not implicate constitutional rights because, "no matter how abhorrent or reprehensible" a racial epithet may be, it cannot itself form the basis of a § 1983 claim. See Wade v. Fisk, 176 A.D.2d 1087, 1089, 575 NYS.2d 394, ___ (1991). Accordingly, the plaintiff's allegations against defendant Shultz, even if true, fail to state a claim for relief.

## V. Recommendation

For the foregoing reasons, the undersigned recommends that the defendants' Motion to Dismiss or for Summary Judgment (dckt. 54) be **GRANTED,** and the plaintiff's Bivens claims be **DISMISSED WITH PREJUDICE** for failure to state a claim upon which relief can be granted.

Within fourten (14) days after being served with a copy of this report and recommendation, any party may file with the Clerk of Court written objections identifying those portions of the recommendation to which objection is made and the basis for such objections. A copy of any objections shall also be submitted to the Honorable John Preston Bailey, United States District Judge. Failure to timely file objections to this recommendation will result in waiver of the right to appeal from a judgment of this Court based upon such recommendation. 28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984).

The Clerk is directed to send a copy of this Report and Recommendation to the *pro se* plaintiff by certified mail, return receipt requested, to the plaintiff's last known address as shown on the docket, and to counsel of record via electronic means.

DATED: April 22, 2011

       /s/ James E. Seibert
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE